**Reversed and Rendered in Part and Affirmed in Part and Opinion filed January 17, 2020.**



In The

# Fourteenth Court of Appeals

## NO. 14-19-00590-CV

## IN THE INTEREST OF V.A. ET AL., CHILDREN

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2018-01783J**

## O P I N I O N

This accelerated appeal arises from a final decree in a suit in which termination of the parent-child relationship was at issue. Tex. Fam. Code § 109.002(a-1). The trial court terminated the parental rights of appellants V.P.[1] (Mother) and O.A. (Father) with respect to their five children and appointed appellee the Department of Family and Protective Services (the Department) to be the children's permanent managing conservator. The trial court found termination of Mother's rights was proper under subsections D and O of Family Code section

---

[1] We use pseudonyms or initials to refer to the children, parents, and other family members involved in this case. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8(b)(2).

161.001(b)(1); Father's, under subsections E, O, and P. On appeal, both parents contend the evidence is legally and factually insufficient to support those statutory findings, as well as the trial court's finding that termination of their parental rights is in the children's best interest. Father also challenges the conservatorship appointment and asks us to remand this case for a new trial in the interest of justice.

We find the evidence legally insufficient to support the trial court's finding as to Mother under subsection D. We reverse the decree as to that finding only and render judgment denying the Department's request as to Mother for termination under subsection D. In all other respects, including the finding as to Mother under subsection O, we affirm the remainder of the decree.

## BACKGROUND[2]

This case concerns five children: Valentina, Benito, Ignacio, Emilia, and Ernesto. They ranged in age from nine years to two months old when this case began.

Before dawn one spring morning, smoke was seen emanating from the family's apartment. Mother and at least the three youngest children were in the apartment at the time. Repeated knocks and calls went unanswered. Apartment personnel entered the apartment with a spare key and ensured everyone was safe. Nobody was hurt. It turned out the fire was caused by food burning on the stove.

Department investigator Stephany Rideaux arrived at the apartment in response to two referrals the Department received about the fire. Rideaux interviewed Mother with the assistance of a Spanish-language interpreter. According to Rideaux, Mother could not answer simple questions about the fire or her

---

[2] Some of the information in this background section comes from the pretrial removal affidavit signed by Department investigator Stephany Rideaux. The affidavit was not admitted into evidence, nor was it offered. We do not rely on the affidavit statements themselves as evidence. If a fact alleged in the affidavit came into evidence at trial through testimony or exhibits, we may include it in our evidentiary-sufficiency analysis.

children's ages. Rideaux worried Mother may not have the "intellectual capacity or mental stability" to take care of the children. The children's maternal grandmother, who lived in the same complex as the family, said Mother has epilepsy but does not take her medication. When Father arrived home, he told Rideaux he takes care of the children and "things at home" but acknowledged the children are in Mother's care when he is at work. Unidentified people expressed concerns about Mother's "stability" and Father's "alcoholic issues leaving the children unsupervised."

Unable to identify a suitable adult with whom the children could stay during the investigation, the Department removed the children on an emergency basis due to "mothers [sic] lack of stability, either emotionally or intellectually, father not being protective, concerns of father [sic] substance abuse even though he denied, and also lack of supervisions [sic]." The Department filed this suit soon thereafter for termination, conservatorship, and protection of the children.

### TRIAL

#### A. Evidence about Mother

##### 1. Epilepsy

Mother has epilepsy. She reportedly experienced her first epileptic seizure at age 16. A point of significant concern and controversy during this case was whether Mother takes her epilepsy medication as prescribed. Compliance with her prescription is a requirement of her family service plan.

Mother did not take her medication while she was pregnant with Ernesto, who was born just two months before this case began. According to Department caseworker LaQuesha Owens, Mother did not begin taking her medication until January 2019, eight months after the case began and six months before trial.

Mother testified she takes her medication as directed; she said she records in

3

a journal when she takes it. She said it had been nearly a year since she failed to take her medication. Father testified he reminds Mother every morning to take her medication, then confirms when he returns home that she took it. Mother's father (Grandfather), who had been living with Mother and Father for about four months at the time of trial, said he also tells Mother to take her medication and leaves the pills out for her. But Claudia Escalante, the children's Court Appointed Special Advocate (CASA), testified she counted Mother's pills and found there were too many in the bottle for Mother to have been taking them as directed. Escalante said Mother told her she does not like taking pills because they make her fat.

Owens testified Mother told her the doctor planned to discontinue her medication because Mother had not had an epileptic seizure in almost a year. Owens pointed out that Mother had not been living with her five children for that year.

There is no evidence in the record regarding what happens if Mother does not take her epilepsy medication as prescribed. Specifically, the record is silent as to how not taking her medication affects her ability to take care of the children.

### 2. Mental capabilities

Mother participated in counseling for about six months, all with counselor Arcadio Rodriguez. The therapy goals for Mother were to attend her medical appointments, refill her medication, and take her medication as prescribed.

Mother completed high school, where she was placed in special education classes. Rodriguez believed her intellectual functioning to be "borderline or probably below." He did not receive any information about her intellectual abilities before therapy, and she does not have appear to be have been evaluated in that realm during the pendency of this case. Rodriguez perceived no symptoms of anxiety, depression, or other mental illness in Mother.

Rodriguez observed Mother to have "poor judgment, very poor decision making skills, and very poor basic life skills that rendered her incapable of being protective of her children." Examples of the life skills he believed she lacks are accessing and using public transportation, getting to medical appointments, obtaining housing, obtaining a checking account, and obtaining identification. Mother reportedly told Rodriguez she did not take her medication because she could not get to the medical appointment necessary for her to get the medication—nobody was available to drive her, she believed she would get lost if she took the bus, and she did not have money to take a taxi. As an example of Mother's poor judgment, Rodriguez cited her plan of not cooking so as to prevent another kitchen fire. He believed she remained in denial throughout her counseling sessions about the prospect of losing her children.

Rodriguez's written discharge summary was admitted into evidence without objection. The summary states in relevant part:

> [Mother] attended and participated in her Individual [sic] counseling sessions. She continues to exhibit poor judgment and poor decision making skills. This calls into serious question her capacity to protect her children in the near and distant future. [Mother] is being discharged from services with a non-recommendation for reunification with her children. As an alternative if [Mother] can secure an adult older that [sic] her to care for her and ensure she takes her seizure medication then reunification with her children would be recommended.

Rodriguez discharged Mother from counseling as "unable to meet counseling goals and objectives." He described her condition on discharge as "unchanged" and her prognosis as "poor."

### 3.     Availability of assistance to Mother

All parties appeared to agree that Mother needed assistance with the children. Grandfather attempted to offer that assistance. He, Mother, and Father moved into a

larger apartment together in preparation for the children returning to the parents. However, that plan proved unworkable because, like Father, Grandfather worked during the day, so Mother would still be alone with the children. Grandmother was not an option because she had history with the Department. Other relatives were unwilling or unable to help.

At trial, Grandfather testified he quit one of his two jobs so that he worked only at night and would be home during the day. Owens pointed out that he would have to sleep at some point during the day. She believed his presence was not the same as his assistance and supervision of Mother and the children.

### 4. Service plan

The Department created family service plans for each parent, and the trial court approved those plans as orders of the court. Each plan stated the Department had "extreme" concern about the children's vulnerability, the caregivers' capabilities, the quality of care provided to the children, the children's home and social environment, and the parents' protective capacities. Still, the stated goal of each plan was family reunification.

The goals, i.e. "changes needed to reduce risk," of Mother's service plan included the following:

> [P]articipate and demonstrate an understanding of the [Department's] efforts to assist her in dealing with issues related to the areas of concerns that have been identified by the [Department].
>
> . . .
>
> [P]articipate in individualized services to assist with any mental health needs, follow all recommendations from the provider, and maintain mental health by taking all medications as prescribed by her attending physician.

To help Mother achieve those goals, her plan required her to attend all visits,

6

meetings, and court dates; stay in contact with the caseworker; maintain a stable, child-friendly home; acquire, maintain for more than six months, and provide documentation of a legal form of income; and participate in a psychological evaluation and follow the evaluator's recommendations. Mother's service plan also required her to participate in an in-person, Department-approved "parenting class and/or counseling"; take all prescribed medications; and undergo a psychiatric assessment in addition to the psychological evaluation.

Mother satisfied many but not all of the requirements of her service plan. She completed a class at the ESCAPE Family Resource Center called "Building Confident Families." She was not compliant with her treatment and medication for epilepsy. She worked briefly at a grocery store but, as of the time of trial, did not have a paying job and relied on Father for income. As for achieving the plan's goals, both Rodriguez and Owens testified that, despite extensive counseling and explanation, Mother never seemed to grasp the importance of taking her medication.

## B.     Evidence about Father

### 1.     Substance abuse

Father repeatedly tested positive by hair follicle test for cocaine and cocaine metabolites. Bruce Jefferies, who owns a drug-testing facility, testified as an expert about Father's results and the nature of cocaine.

Father was first tested when the children were removed in April 2018. Jefferies explained that 20,000 picograms/microgram (pg/mg) indicates chronic, daily use of cocaine. He opined that the first cocaine level of 12,224 pg/mg reflected Father used cocaine "definitely more than one time" and was "about halfway to being a chronic user." By June 2018, Father's cocaine level had fallen by almost half. Just six weeks later, though, the level was nearly identical to that in April 2018.

Diagnosed with "mild stimulant use disorder," Father completed court-ordered substance abuse counseling in September 2018.[3] He did not appear for a scheduled drug test that month, though the record suggests his absence was unintentional. But in December 2018, Father's cocaine level spiked to 14,892 pg/mg—higher than it was in April of that year. The level decreased through the six months leading up to trial. Based on all the results, Jefferies estimated the last time Father used cocaine was sometime between December 2018 and March 2019. Father testified he had not used cocaine in more than four months, which would align with Jefferies' estimate.

One of cocaine's metabolites, cocaethylene, occurs when cocaine and alcohol are ingested contemporaneously. Jefferies said the amount of alcohol ingested cannot be determined from the cocaethylene level alone. Father's cocaethylene levels followed a similar, though not parallel, path as his cocaine levels.

Though consistently positive for cocaethylene, Father was consistently negative for alcohol. Father testified he "used to drink a lot," but, as of the time of trial, he drank only once or twice a month. He said he "[doesn't] drink that much"; he "just drink[s] about six [beers]." According to Father, he did not drink in his children's presence; he always drank away from home and used a designated driver.

## 2. Leaving children in Mother's care

Father testified he works every day except Sunday, from 8:00 a.m. to 5:00 p.m. Mother takes care of the children while he is out of the house. He added, "When she's 100 percent well, she can do it." He said Mother does all the cooking.

---

[3] Owens testified Father was ordered to and did complete "individual substance abuse counseling." Father states in his brief that there is no evidence that he was ever requested to enter a "drug treatment program."

### 3. Service plan

Two goals of Father's family service plan were drug-related:

> [G]ain an acceptance and understanding of the role that he plays in the current situation and how his lack of age appropriate parenting skills and drug usage (if applicable) may be affecting the care of his children.
>
> . . .
>
> [D]emonstrate an acceptance of his parental responsibility and a willingness to provide a safe, stable, drug free, and permanent environment for his children in which their needs are met.

Like Mother's, Father's plan required him to attend all visits, meetings, and court dates; stay in contact with the caseworker; maintain a stable, child-friendly home; acquire, maintain, and provide documentation of a legal form of income; and undergo a psychological evaluation and follow the evaluator's recommendations. His plan further required him to provide financial or in-kind support for the children while they were in the Department's custody and participate in a substance abuse assessment and follow all the assessor's recommendations. Father completed the same "Building Confident Families" course as Mother. Owens testified Father completed all the required tasks of his service plan except one: staying sober.

### 4. Relationship with children

Father visited the children regularly. Owens described him as "very engaged" with them during the visits. When any behavioral issues arose, Father addressed them with the children. Escalante, though, testified the children did not interact much with either parent. She said it was more like everyone was in the same room but acting individually.

## C.    Evidence about the children

### 1.    The children's progress

The evidence about the children comes from the progress notes of their therapist, Amparo Makridis, and the testimony of Owens and Escalante.

Just shy of nine years old when this case began, Valentina performed academically below her grade level and showed signs of a learning disability. She struggled with poor hygiene. Valentina was overprotective of three-year-old Emilia, generally trying to mother her. According to Valentina's foster mother, Valentina looked worried, was apprehensive, and did not express her thoughts or feelings. By the time of trial, Valentina had improved in school and was on target academically.

The second oldest child, Benito, was six and a half years old when he was removed. He acted aggressively with other children in his foster homes, tattled constantly, and lied about many topics, including hygiene tasks such as showering and brushing his teeth. Benito reportedly made an outcry of physical abuse by Father; the record does not reflect what came of that outcry. Benito's behavior improved somewhat over the next year, though he continued to struggle to control his impulses and manage his anger.

Four-year-old Ignacio experienced challenges similar to those of his older siblings. Like Valentina, he struggled academically when the case began. He performed below grade level and also showed indicators of a learning disability. Behaviorally, Ignacio imitated Benito, acting aggressively with other children. Ignacio also displayed poor hygiene. The record reveals little about Ignacio's progress over the year other than Owens' blanket statement that the children were "doing great."

Emilia is a year younger than Ignacio and had not started school by the time

of trial. Her foster mother reported she was hyperactive and aggressive, used foul language, did not accept limits or redirection, and needed constant supervision because she was physically destructive. Two months before trial, Emilia was removed from her foster home because the foster mother no longer felt equipped to take care of her. Emilia was placed in a foster home with Spanish-speaking caregivers and five other children. The second foster mother told Escalante she had not witnessed any "extreme" behavioral problems.

Two months old when he was removed, Ernesto bonded very well with his foster family. The 16-month-old toddler was happy and developmentally on target at the time of trial.

### 2.     Relationship with parents

Mother and Father both visited the children regularly. During the visits, Escalante testified, the children did not interact much with either parent. She said it was more like everyone was in the same room but acting individually. Owens echoed that sentiment, saying the children played on the parents' phones while the parents watched. Owens also testified, however, that Father was "very engaged" with the children during the visits. When any behavioral issues arose, Father addressed them with the children.

Owens and Escalante both testified Father held and played with the baby, Ernesto, but Mother generally did not. Mother, by contrast, testified she often played with Ernesto during their visits. Owens also noted that Mother initially would feed Ernesto only half his formula. On the whole, Owens said, the interaction between Mother and Ernesto improved over time.

### 3.     Plans for the future

At the time of trial, the children lived in three foster homes: Valentina, Benito,

and Ignacio in one; Emilia in a second; and Ernesto in a third. The foster parents of the three oldest children did not plan to adopt them. Ernesto's foster parents expressed a desire to adopt all five children. They remodeled their home to make room for the large family. However, their plan was put on hold due to some health problems with their biological child.

Both Valentina and Benito wanted to go home to live with their parents if possible. If not, both wanted to stay in their foster home—not Ernesto's foster home. Ignacio said he wanted to stay in his foster home with Valentina and Benito, but Owens testified he did not seem to understand the question. Owens expressed similar doubt about Emilia's understanding, saying, "[Y]ou're not going to get a definite answer from her. She understands English, but she speaks limited English and just like nods her head all the time." All four of the older children were getting to know Ernesto's foster parents. If those foster parents cannot adopt all the siblings, Escalante recommends the Department try to find another placement that can take all five children.

### D.    Trial court's findings

The trial court found termination of Mother's and Father's parental rights was in the children's best interest and was justified under several subsections of section 161.001(b)(1) of the Family Code. The subsections for Mother were D (endangerment by environment) and O (failure to comply with a court-ordered plan for reunification with the children). For Father, the subsections were E (endangerment by conduct), O, and P (endangering substance abuse even after court-ordered treatment). The trial court appointed the Department to be the children's managing conservator. This appeal followed.

ANALYSIS

## I.      Burdens of proof and standards of review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, the child's emotional and physical interests must not be sacrificed to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Parental rights may be terminated if clear and convincing evidence shows (1) the parent committed an act described in section 161.001(b)(1) of the Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code § 161.001(b)(1), (2). Only one predicate finding under section 161.001(b)(1), along with the best-interest determination, is necessary to support termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007. This high burden reflects the severity of termination.

The heightened burden of proof results in heightened standards of review for evidentiary sufficiency:

- *Legal sufficiency.* We consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could disbelieve. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

- *Factual sufficiency.* We consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We consider whether disputed evidence is such that a reasonable fact finder could not have resolved

that dispute in favor of its finding. *C.H.*, 89 S.W.3d at 25.

The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder "could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

## II.    Predicate ground for termination

If a parent has had his or her parental rights terminated based on a finding under section 161.001(b)(1)(D) or (E), that finding may serve as the basis for a future termination of parental rights. Tex. Fam. Code § 161.001(b)(1)(M) (allowing termination if parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state"). Because subsection M alone provides a sufficient basis to terminate parental rights based on a previous subsection D or E finding, due process concerns, coupled with the requirement for a meaningful appeal, mandate that a court of appeals affirming a termination on either subsection D or E provide the details of its analysis. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam).

Each parent challenges the legal and factual sufficiency of each predicate ground of termination. For Mother, we conclude the evidence is insufficient to support termination under subsection D but sufficient under subsection O. For Father, we conclude the evidence is sufficient to support termination under subsection E, so we do not review the subsection O and P findings.

### A.     Mother

#### 1.     161.001(b)(1)(D): endangerment by environment

Mother's first issue challenges the legal and factual sufficiency of the evidence to support the trial court's finding under subsection D. Termination under subsection D requires clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(D). "Endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). Endangerment under subsection D focuses on evidence related to the child's environment. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home. *In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

A child is endangered when the environment creates a potential for danger and the parent is aware of the danger but consciously disregards it. *See In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Parental rights may be terminated under subsection D based on a single act or omission. *See In re D.M.K.*, No. 14-13-00230-CV, 2013 WL 5347392, at *10 (Tex. App.—Houston [14th Dist.] Aug. 27, 2013, no pet.) (mem. op.). In evaluating endangerment under subsection D, the court is to consider the children's environment before the Department obtained custody. *See In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Subsection D is not a basis for termination of parental rights if the parent was unaware of the endangering environment. *S.M.L.*, 171 S.W.3d at 477. There must be clear and convincing evidence both of

endangerment and the parent's awareness of the endangering environment.

The San Antonio Court of Appeals recently considered whether a mother who suffered from epilepsy and mental illness endangered her children under subsection D. The court wrote:

> Mom is in her early twenties, she has epilepsy, and she has been having seizures since she was about three years old. Mom knows that she has tonic-clonic (grand mal) seizures, and she will be hospitalized if her seizure lasts more than thirty minutes. She knows she will be incoherent for 15–30 minutes after a seizure. In the roughly five months between A.D.G.'s birth and her removal from the home, Mom suffered four seizures. In a recent seizure, for the first time, she went into respiratory failure and had to be intubated.

*In re A.D.G.*, No. 04-18-00413-CV, 2019 WL 6499223, *2 (Tex. App.—San Antonio Dec. 4, 2019, no pet. h.) (mem. op.). Those facts regarding her epilepsy, combined with the mother's "failure to successfully manage her mental health conditions," led the court to conclude there was sufficient evidence of endangerment under subsection D. *Id.* at *5.

In this case, there is some evidence Mother has epilepsy, did not take her epilepsy medication, and experienced an epileptic seizure near the time of the kitchen fire that gave rise to this case.[4] Those three facts are all we know about her condition at that time. The record contains no evidence to answer the following questions:

- What happens when Mother has a seizure?

- Does the frequency decrease and/or do the symptoms abate when she takes her medication as prescribed?

---

[4] We note the only direct evidence that Mother experienced an epileptic seizure, as opposed to another medical event, is Mother's later statement to that effect to her counselor. We also note the testimony from several witnesses suggesting Mother may not fully understand or be able to articulate facts relating to her condition.

- How does a seizure affect her ability to protect her children?

- How frequently did she have seizures before the fire?

- When was her last seizure before the fire?

- How often did Mother fail to take her medication before the fire—occasionally, always, or something between the two?

- Was Mother advised to take her medication while she was pregnant but she did not take it, or was she advised not to take it?

- Was Mother, two months postpartum, breastfeeding Ernesto, and if so, was she advised to take her medication but did not, or was she advised not to take it?

- What affect, if any, did Mother's recent pregnancy and her postpartum status have on her seizures?

We do not mean to suggest each of those questions must be answered, nor do we suggest answering all those questions would be enough to establish endangerment under subsection D. But without evidence to answer any of those questions, we conclude no reasonable fact finder could have formed a firm belief or conviction that Mother knowingly endangered her children by not taking her epilepsy medication as prescribed. *J.F.C.*, 96 S.W.3d at 266.

The Department contends Mother also knowingly endangered the children by allowing them to be in the home with Father, who used cocaine and drank alcohol. There is no evidence that Mother knew Father used cocaine. There is some evidence Mother knew Father drank, but there is no evidence he drank enough to endanger the children while they were in his care. The Department cites Benito's reported statements to his foster mother that Father "drank every day and would hit him and his brother." There is no evidence that Mother knew Father hit Benito or his brother, and there is no evidence she left the children alone with Father such that they were unsupervised or unprotected.

17

We conclude the evidence is legally insufficient to support the trial court's finding that Mother engaged in the conduct described in Family Code section 161.001(b)(1)(D). We sustain Mother's first issue on legal insufficiency and do not need to reach the question of factual insufficiency.

## 2. 161.001(b)(1)(O): failure to comply with court-ordered plan

In her second issue, Mother contends the evidence is legally and factually insufficient to support the trial court's finding under subsection O. That subsection requires clear and convincing evidence that the parent:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

Tex. Fam. Code § 161.001(b)(1)(O); *see N.G.*, 577 S.W.3d at 237.

Mother does not dispute that: (1) her family service plan was a court order that specifically established the actions necessary for her to obtain the return of her children; (2) the children were in the temporary managing conservatorship of the Department for not less than nine months; and (3) the children were removed under Family Code chapter 262 for abuse or neglect. She challenges only the finding that she "failed to comply" with that order.[5]

Mother contends she complied with the plan by attending all required counseling sessions, consistently testing negative for drugs and alcohol, refraining from criminal activity, and visiting her children regularly. Mother's negative drug

---

[5] On appeal, Mother notes the trial court did not require the Department to provide her with a service plan written in Spanish and tailored to her medical and intellectual needs under the Americans with Disabilities Act. She concedes, though, that she did not preserve error in the trial court on those points. *See* Tex. R. App. P. 33.1(a)(1).

and alcohol tests are commendable, as is her lack of criminal activity, but neither was a requirement of her service plan. The requirements of her service plan that she did not satisfy were: (1) acquire, maintain for more than six months, and provide documentation of a legal form of income; and (2) take all prescribed medications.

Our sufficiency analysis does not depend on the wisdom of the service plan's requirements. It is undisputed she did not satisfy the employment requirement. Though the record contains no evidence about the details of Mother's epilepsy or treatment, we do not presume to question the efficacy of her prescription. For purposes of subsection O, all we may consider is that she was prescribed to take medication, and there is some evidence to support an inference that she did not take her medication as prescribed. Therefore, we conclude the evidence is legally and factually sufficient to support termination under subsection O. We overrule Mother's second issue.

### B.     Father: 161.001(b)(1)(E): endangerment by conduct

Father's first issue challenges the legal and factual sufficiency of the evidence to support the trial court's finding under subsection E. Family Code section 161.001(b)(1)(E) requires clear and convincing evidence the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "Conduct" includes acts and failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

Subsection E requires evidence the endangerment resulted from the parent's conduct. *S.R.*, 452 S.W.3d at 360. Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* at 361. A court may consider actions and inactions occurring both before and after a child's birth to establish a "course of

19

conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury. Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.L.H.*, 515 S.W.3d 60, 92 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

*Substance abuse.* A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). A parent's drug use exposes the child to the possibility the parent may be impaired or imprisoned and, thus, unable to take care of the child. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Continued illegal drug use after a child's removal is conduct jeopardizing parental rights and may be considered an endangering course of conduct. *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc). The fact finder may give "great weight" to the "significant factor" of drug-related conduct. *L.G.R.*, 498 S.W.3d at 204.

Father tested positive for cocaine in his hair follicle in April 2018. He continued to test positive for the next few months, though his levels decreased, suggesting the positive result was due to residual amounts left in his hair. He completed substance abuse counseling in September 2018. But in December 2018, he tested positive with levels higher than those in April, implying he resumed using

cocaine after he completed counseling and while he was at risk of losing his children. As fact finder, the trial court could give "great weight" to the "significant factor" of Father's continued drug use after his children were removed and find it to be an endangering course of conduct. *L.G.R.*, 498 S.W.3d at 204; *Cervantes-Peterson*, 221 S.W.3d at 253–54.

At trial, Father did not deny his cocaine usage, but rather said he was willing to go to therapy to "leave all that." He asked for "another opportunity" to be with the children. The trial court was free to disregard Father's self-serving testimony. *H.R.M.*, 209 S.W.3d at 109.

Under the applicable standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's finding that Father endangered the children as described in subsection E. Having affirmed one statutory ground of termination, we need not reach the other grounds. *A.V.*, 113 S.W.3d at 362. We overrule Father's first three issues.

## III. Best interest

Mother's third and Father's fourth issues challenge the trial court's best-interest finding. Termination must be in the child's best interest. Tex. Fam. Code § 161.001(b)(2). Texas courts presume two conditions to be in a child's best interest: (1) prompt, permanent placement in a safe environment, *id.* § 263.307(a); and (2) remaining with the child's natural parent. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g). The best-interest analysis focuses on the child, not the parent. *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.).

Courts may consider these non-exclusive factors, known as the *Holley* factors, in the best-interest analysis: the desires of the child; the physical and emotional needs of the child now and in the future; the physical and emotional danger to the child

now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The Family Code also identifies factors the court may consider in evaluating a parent's willingness and ability to provide the child with a safe environment. Tex. Fam. Code § 263.307(b). Finally, evidence supporting the statutory predicate of termination is relevant to the best-interest analysis. *S.R.*, 452 S.W.3d at 366.

***Children's desires and needs.*** Valentina and Benito wanted to go home to live with their parents if possible. If not, both wanted to stay in their current foster home. There is no evidence they wanted to go to their baby brother Ernesto's foster home even though Ernesto's foster parents wanted to adopt all five children. Ignacio said he wanted to stay in his foster home with Valentina and Benito, but Owens testified he did not seem to understand the question. Owens expressed similar doubt about Emilia's understanding. Ernesto, age 16 months at the time of trial, was too young to express his desires verbally. When a child is too young to express his desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent. *L.G.R.*, 498 S.W.3d at 205; *J.D.*, 436 S.W.3d at 118. The undisputed evidence shows that Ernesto has bonded well with his foster family and they are meeting all this needs. Ernesto spent only the first two months of his life with Mother and Father.

22

Our analysis of the present and future physical and emotional needs of the children focuses on the children's innate need for permanence. *D.R.A.*, 374 S.W.3d at 533. While some children may have extraordinary physical and emotional needs requiring extra care, all children have physical and emotional needs that must be met on a daily basis. Some evidence shows that Valentina and Ignacio may need extra educational support. Each child except the baby manifested some behavioral or emotional problems, as well as poor hygiene skills.

***Predicate grounds of termination.*** Evidence supporting termination under the grounds listed in section 161.001(b)(1) can be considered in support of a finding that termination is in the child's best interest. *See C.H.*, 89 S.W.3d at 27. The trial court could properly consider Mother's failure to comply with her service plan and Father's endangerment of the children as factors in the best-interest analysis.

***Father's service plan.*** Owens testified Father completed all requirements of his service plan except for staying sober. On appeal, Father argues testing negative for drugs was not a requirement of his plan. He says all that was required was that he "complete a drug/alcohol assessment" and "follow any and all recommendations" from the assessment, and it is undisputed he did both. Father is splitting hairs. One of his plan's stated goals, also described as "changes needed to reduce risk," was to "demonstrate an acceptance of his parental responsibility and a willingness and ability to provide a safe, stable, **drug free**, and permanent environment for his children in which their needs are met" (boldface added). From a goal of a "willingness and ability to provide a . . . drug free . . . environment," a reasonable fact finder could infer that the service plan required the parent not to use drugs.

***Willingness and ability to care for the children.*** The record contains conflicting evidence about Mother's ability to care for the children. Father testified, "When she's 100 percent well, she can do it." In Rodriguez's opinion, Mother could

23

care for her children if a capable adult was with them at all times. Both Rodriguez and Owens believed Mother did not understand the danger her untreated epilepsy poses to the children. As to Father, his continued cocaine usage is some evidence that he is unwilling to maintain the sobriety needed to care for his children. There is no suggestion that he is unable to care for the children when he is sober.

***Programs available.*** Mother and Father both took advantage of the parenting classes they completed as part of their family service plans. Father also completed substance abuse counseling as a requirement of his service plan. There is no evidence regarding other programs available to assist Mother or Father in promoting the children's best interest.

***Stability of proposed placement.*** The Department's plan was for all five children to be adopted by Ernesto's foster parents. The foster parents had remodeled their home to accommodate the large family. The viability of that plan was called into question at trial because the foster parents were dealing with some health issues with their biological child. If the foster parents were not able to adopt all five children, Escalante wanted the Department to seek an adoptive placement that could take the whole family.

Under the applicable standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother's and Father's parental rights is in the children's best interest. We overrule Mother's third and Father's fourth issues.

## IV. Conservatorship

In his fifth issue, Father contends the trial court erred in naming the Department as the children's managing conservator. We review a trial court's appointment of a non-parent as sole managing conservator for an abuse of discretion, and we reverse only if we determine the appointment is arbitrary or unreasonable.

*In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

A parent shall be named a child's managing conservator unless, as relevant here, the court finds that such appointment would significantly impair the child's physical health or emotional development. *See* Tex. Fam. Code § 153.131(a). The trial court made this finding, and it also found appointing the Department as managing conservator was in the children's best interest.

However, when the parents' rights are terminated, as in this case, section 161.207 of the Family Code controls the appointment of a managing conservator. *See In re I.L.G.*, 531 S.W.3d 346, 356–57 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Section 161.207 states:

> If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child.

Tex. Fam. Code § 161.207(a). The appointment may be considered a "consequence of the termination." *L.G.R.*, 498 S.W.3d at 207.

Because the trial court terminated both parents' rights, its conservatorship decision in this case was governed by section 161.207, not section 153.131. *See I.L.G.*, 531 S.W.3d at 357; *L.G.R.*, 498 S.W.3d at 207. Accordingly, the trial court was required to appoint the Department or another permissible adult or agency as the children's managing conservator. Tex. Fam. Code § 161.207.

Father offers no argument as to how the trial court abused its discretion in naming the Department, rather than another permissible adult or agency, to be the children's managing conservator. Instead, he contends the evidence is legally and factually insufficient to support the trial court's finding that appointment of the Department as managing conservator is in the children's best interest. But our review

of a conservatorship decision is for abuse of discretion only, not for evidentiary sufficiency. *J.A.J.*, 243 S.W.3d at 616. We cannot say the trial court's decision to appoint the Department, an agency statutorily identified as an eligible managing conservator, was arbitrary or unreasonable. *See id.* We overrule Father's fifth issue.

## V.    Remand "in the interest of justice"

In his sixth issue, Father asks that we reverse the decree and remand this case in the interest of justice. *See* Tex. R. App. P. 43.3(b). He argues, essentially, that this was a close case and the parents should have another opportunity.

The "most compelling" reason to remand in the interest of justice is the overruling of existing precedent on which the losing party relied at trial. *Westgate, Ltd. v. State*, 843 S.W.2d 448, 455 (Tex. 1992). Remand may also be appropriate when it appears from the record that the losing party might be able to recover under some other established legal theory that was not developed at the first trial. *Id.* Finally, remand in the interest of justice may be proper when a new standard of review is announced. *Id.* This case presents none of those circumstances.

Father also complains that the children's attorney ad litem did not advocate for what the children wanted: to return home to their parents. Assuming without deciding that Father has standing to raise a complaint about the effectiveness of the children's lawyer, we note that the trial court did hear evidence about the children's desires, and we have relied on that evidence in our analysis. We overrule Father's sixth issue.

## CONCLUSION

We reverse the decree only as to the trial court's finding regarding Mother under section 161.001(b)(1)(D), and we render judgment denying the Department's

request as to Mother for termination under section 161.001(b)(1)(D). *See* Tex. R. App. P. 43.2(c). We affirm the decree in all other respects.

/s/    Meagan Hassan
         Justice

Panel consists of Justices Zimmerer, Spain, and Hassan.